UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/23/2016
```

--------------------------------------------------------------X
JOHN OLAGUES,                                    :
                                                 :
                                Plaintiff,        :
                                                 :          1:15-cv-0898-GHW
                  -v-                             :          1:15-cv-2476-GHW
                                                 :          1:15-cv-2478-GHW
CARL C. ICAHN, HIGH RIVER LIMITED                 :
PARTNERSHIP, ICAHN PARTNERS LP,                   :          MEMORANDUM OPINION
ICAHN PARTNERS MASTER FUND LP,                    :              AND ORDER
ICAHN PARTNERS MASTER FUND II LP, and             :
ICAHN PARTNERS MASTER FUND III LP,                :
                                                 :
                                                 :
                                Defendants.       :
--------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

        Plaintiff, Mr. John Olagues, contends that Defendants understated the short-swing profit

that they received upon the cancellation of certain put options.  The relevant rule issued by the

Securities and Exchange Commission—Rule 16b-6(d)—states that the profit obtained upon

cancellation of such options may not exceed the amount of the premium received by the writer of

the put.  Plaintiff asserts that Defendants' profits exceeded the $0.01 per share premium actually

paid to them for writing the puts.  Instead, by deconstructing Defendants' transactions and pricing

the resulting component parts, Plaintiff postulates that Defendants also received the benefit of an

implicit discount embedded within the transactions.  He seeks to recapture the "value" of that

discount as a short-swing profit.  Because Section 16(b) liability cannot be established, or enhanced,

by a creative plaintiff's "strained attempt to carve up a single . . . transaction by calling it something

which it is not," *Freedman v. Barrow*, 427 F. Supp. 1129, 1152 (S.D.N.Y. 1976), the Court grants

Defendants' motions to dismiss.

I.     **Background**

A.  **Factual Background**[1]

Plaintiff, Mr. John Olagues, is a shareholder of three companies:  Herbalife, Ltd.

("Herbalife"), Hologic, Inc. ("Hologic"), and Nuance Communications, Inc. ("Nuance").  Herbalife

Compl. ¶ 3, Hologic Compl. ¶ 3, Nuance Compl. ¶ 3.  The common stock of each of those three

companies is registered with the United States Securities and Exchange Commission (the "SEC")

pursuant to Section 12 of the Securities Exchange Act and is traded on NASDAQ.  Herbalife

Compl.  ¶ 10, Hologic Compl.  ¶ 10, Nuance Compl. ¶ 10.  Mr. Carl C. Icahn ultimately manages the

investments of each of the limited partnerships named as defendants in these related cases (together

with Mr. Icahn, "Defendants").  Herbalife Compl. ¶¶ 5-9, Hologic Compl. ¶¶ 5-9, Nuance Compl.

¶¶ 5-9.  The Defendants were, at all relevant times, statutory insiders holding more than 10% of the

stock of each of Herbalife, Hologic, and Nuance.  Herbalife Compl. ¶ 17, Hologic Compl. ¶ 15,

Nuance Compl. ¶ 16.

Plaintiff filed three separate actions alleging that Defendants violated section 16(b) of the

Exchange Act of 1934 ("Section 16(b)"), 15 U.S.C. § 78p(b), by failing to disgorge short-swing

profits that they obtained from derivative transactions involving Herbalife, Hologic, and Nuance.

The facts in each case differ—each case involves the stock of a separate issuer, and different trades

and trade prices.  But all three cases rest on a common theory regarding how Defendants' profits

from the derivative transactions at issue should be calculated.  Because the Court concludes that

---

[1] Unless otherwise noted, the facts are taken from Plaintiff's complaints in actions 15-cv-898, Dkt. No. 21 ("Herbalife Compl."), 15-cv-2467, Dkt. No. 1 ("Hologic Compl."), and 15-cv-2478, Dkt. No. 1 ("Nuance Compl."), which, with the exception of the specific transactions at issue, advance similar if not identical allegations.  Although the securities issuers have since been dismissed, *see infra* Part I.B, the Court will refer to the complaints using the corresponding issuer for ease of reference.  The Court will accept the facts as alleged in the complaints as true for the purposes of these Rule 12(b)(6) motions.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

theory is unsound, the Court focuses below on the details of only one of the three actions—
Herbalife.  Plaintiff's allegations regarding Defendants' transactions in Herbalife parallel those in his
other two cases, but because the Herbalife case involves the fewest individual trades, it is the
simplest vehicle for illustrating the flaws in Plaintiff's theory.

Before turning to the specifics of the Herbalife transaction, a very short primer on the type
of derivative transactions at issue in these cases is in order.[2]  The cases all involve put options and
call options of each issuer's stock.  A put involves two parties—the put seller and the put buyer.  By
entering into a put, the put buyer obtains the right to force the put seller to buy shares within an
agreed-upon time frame at an agreed price—the exercise price.  Herbalife Compl. ¶ 18.  In exchange
for committing to buy the shares, the "put seller receives a fee—the premium." *Id.* ¶ 20.  Plaintiff
concisely explains the economic incentives associated with a put as follows:

> If the stock's price falls below the strike price, the put buyer is likely to exercise the
> put option and the put seller will likely have to purchase shares from the put buyer
> when the options is exercised.  Therefore, *a put seller usually has a neutral or positive
> outlook on the stock* that he can use to create a profitable position.  If the stock price
> ultimately moves in line with this outlook, the put is unlikely to be exercised and the
> put writer keeps the premium as a profit for writing the put.

*Id.* (emphasis added).

Conversely, a call option gives the buyer of the option the right to buy shares of an
underlying stock at a specified, predetermined price—the exercise price—during a specified time
period.  The call option seller is obligated to sell those shares to the call option buyer if the buyer
exercises the right to do so before the expiration date.  *See* Introduction to Options.  In other words,
a call option allows the buyer to "call in" the shares.  To retain the right to do so, the call option

---

[2] This description of the puts and calls at issue in this case is derived from the Herbalife complaint.  If the
reader wants to learn more, additional information is available from the SEC Investor Bulletin:  An
Introduction to Options, https://www.sec.gov/oiea/investor-alerts-bulletins/ib_introductionoptions.html
(Mar. 18, 2015) ("Introduction to Options").

buyer pays a premium to the call option seller.  *Id.*  A call option buyer is more likely to exercise the right to call in the shares if the stock price goes above the exercise price.  At that point, the buyer can purchase shares at the lower price and make a profit by selling the shares at the higher market price.  *Id.*

As alleged in the Herbalife Complaint, the Defendants entered into agreements, pursuant to which they acquired both puts and corresponding calls for Herbalife stock.  Herbalife Compl. ¶ 22.  Each of the put options had an exercise price of $23.50, and an expiration date of May 10, 2013.  *Id.* ¶ 18.  The premium paid to the Defendants for writing the puts was $0.01 per share.  *Id.*  The Herbalife Complaint lays out the specific put transactions as follows:

| Date | Number of Shares | Exercise Price | Expiration Date | Price |
|------|------------------|----------------|-----------------|-------|
| February 12, 2013 | 1,167,241 | $23.50 | May 10, 2013 | $0.01 |
| February 13, 2013 | 508,311 | $23.50 | May 10, 2013 | $0.01 |
| February 14, 2013 | 1,555,054 | $23.50 | May 10, 2013 | $0.01 |

In the same agreement in which the Defendants acquired the puts, they also acquired corresponding call options over Herbalife stock.  *Id.* ¶ 22.[3]  The exercise price for each of the call options was also $23.50; like the put options, the call options expired on May 10, 2013.  The price of each of the call options varied for each of the dates on which the call options were written, as illustrated in the following chart from the Herbalife Complaint:

---

[3] Each of the complaints alleges that the instruments pursuant to which Defendants acquired the relevant puts and calls were generically termed "Put and Call Option agreements."  *See, e.g.,* Herbalife Compl. ¶ 22.  Consistent with that allegation, there is no dispute that the puts and corresponding calls were acquired pursuant to integrated agreements containing both the put and the corresponding call.  *See, e.g.,* Memorandum of Law in Opposition to Defendants' Motion to Dismiss, Dkt. No. 37 ("Herbalife Opposition") at 13.  Defendants request that the Court take judicial notice of the fact that the agreements at issue were a particular variety of agreement, known as a "Delta One" financial instrument, as described in a Wikipedia entry.  Defs.' Mem. of Law in Supp. of the Mots. to Dismiss ("Defs.' Br.") at 3-4.  The Court declines to take judicial notice of the asserted fact that the instruments at issue were Delta One instruments.  Instead, the Court accepts as true the complaints' allegation that the puts and calls were acquired pursuant to generic "Put and Call Option agreements" containing the terms described in each of the complaints.

| Date | Number of Shares | Exercise Price | Expiration Date | Price |
|------|------------------|----------------|-----------------|-------|
| February 12, 2013 | 1,167,241 | $23.50 | May 10, 2013 | $12.51 |
| February 13, 2013 | 508,311 | $23.50 | May 10, 2013 | $12.78 |
| February 14, 2013 | 1,555,054 | $23.50 | May 10, 2013 | $14.05 |

The put and call options acquired by Defendants were structured so that the put options would expire immediately if the corresponding call options were exercised. Herbalife Compl. ¶ 22. As Plaintiff describes in his opposition, "[t]he Icahn transactions were structured such that the Corresponding Call Options purchased by Defendants and the Put Options written by them contained mutually offsetting terms, such that Defendants' exercise of the Call Option caused the expiration of the Put Options." Herbalife Opposition at 9. Because Defendants could choose when to exercise the call options, they could choose the date on which the put options would terminate—in that event, the put options would terminate on the date of exercise of the call, not May 10. And indeed, on February 28, 2013, approximately two weeks after they entered into each of the put and call agreements, Defendants exercised the call options "and therefore, pursuant to the Put and Call Option agreements, all of the Put Options expired, i.e., they were cancelled." Herbalife Compl. ¶ 23.

The cancellation of the put options generated short-swing profits for Defendants. Rule 16b-6(d) issued by the SEC explains how short-swing profits should be calculated when an option, such as the put options here, is cancelled: "Upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. *The profit shall not exceed the premium received for writing the option.*" 17 C.F.R. § 240.16b–6(d) ("Rule 16b-6(d)") (emphasis added). Defendants reported that they received $0.01 per share in premium for the put options. Herbalife Compl. ¶ 25. Although not pleaded in the complaints, Plaintiff and Defendants agree that Defendants have reimbursed

Herbalife that amount, and that Defendants reimbursed Hologic and Nuance the equivalent amounts.[4]

Plaintiff's theory in all three cases is that the correct measure of Defendants' profits is not the $0.01 per share "premium received" by Defendants for writing the cancelled puts, as specified in the relevant agreements, and as reported by Defendants.  Plaintiff asserts instead that "the premium the Icahn Entities reported receiving from the writing of the Put Options did not reflect the true economic value of those transactions and the Icahn Entities in fact received additional consideration for writing the Put Options which they failed to report."  Herbalife Compl. ¶ 32.  Plaintiff arrives at that conclusion by deconstructing the integrated put and call agreements into their separate component parts.  Then he prices those separate elements, using information available for similar, open-market trades.  He then compares those prices with those embedded in Defendants' transactions.  Having done so, Plaintiff assesses that the premium Defendants charged for the puts was too low, and that the exercise price for the call options was also too low.  He concludes that "the amounts the Icahn Entities reported receiving from the writing of the Put Options did not reflect the true premium *consideration obtained*, as the amounts reported did not include the discounts, offsets or deductions obtained on the premiums paid for the Call Options."  Herbalife Comp. ¶ 30 (emphasis added).  The reader will note that Plaintiff's theory seeks to recover the "premium consideration obtained," rather than "premium received," as provided in Rule 16b-6(d).  And the Court will discuss that distinction.  But, first, we turn to the facts pleaded to support Plaintiff's theory.

---

[4] Plaintiff's counsel advised the Court that "[i]ndeed, [Defendants] have conceded in some fashion that there is Section 16(b) liability because they have paid back the one penny to the issuers."  May 17, 2015 Hr'g Tr. at 3.  Dkt. No. 29 in 1:15-cv-898-GHW.

The put and call options acquired by Defendants were bespoke transactions, negotiated between them and unidentified counterparties.  Such transactions are referred to as "over-the-counter" transactions, and take place on what the Plaintiff describes as the "over-the-counter market."  *Id.* ¶ 26.  As Plaintiff describes, "over-the-counter options traders can choose the characteristics of the options traded."  *Id.*  Because Defendants executed their trades over-the-counter, "they were able to arrange a specific strike price and a specific expiration date."  *Id.*

To evaluate the pricing of Defendants' transactions, Plaintiff pulled a sample of the prices for put and call options available on the open market as reported by the Chicago Board Options Exchange (the "CBOE").  *Id.*  Plaintiff describes the CBOE as "a regulated options exchange where the terms of each option are standardized by the exchange, i.e., the underlying asset, quantity, expiration date and strike price are known in advance."  *Id.*  Plaintiff was not able to obtain identical comparisons for Defendants' put options, but he details "similar" put options that he found reported by the CBOE:

- February 12, 2013—a put written that day for Herbalife Common Stock with a strike price of $22.5 and an expiration date of May 18, 2013 had a bid of $0.90 and an ask of $1.1 per share;
- February 12, 2013—a put written that day for Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $1.1 and an ask of $1.3 per share;
- February 13, 2013—a put written that day for Herbalife Common Stock with a strike price of $22.5 and an expiration date of May 18, 2013 had a bid of $0.80 and an ask of $1 per share;
- February 13, 2013—a put written that day with Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $1 and an ask of $1.2 per share;
- February 14, 2013—a put written that day with Herbalife Common Stock with a strike price of $22.50 and an expiration date of May 18, 2013 had a bid of $0.70 and an ask of $0.85 per share; and
- February 14, 2013—a put written that day for Herbalife Common Stock with a strike price of $24 and an expiration date of May 18, 2013 had a bid of $0.90 and an ask of $1.1 per share.

*Id.*

Plaintiff acknowledges that these quotes are "similar, albeit not identical" to the terms of the puts acquired by Defendant. *Id.* ¶ 27. Apart from the pricing term, which is the focus of Plaintiff's analysis, the quoted puts have different expiration dates and strike prices than those acquired by Defendants. Significantly, all of these prices were reported for open market quotes for stand-alone put rights only—they relate to only one leg of the put and call agreements entered into by Defendants. Plaintiff does not plead that the stand-alone put rights for which he obtained pricing have other features similar to those contained in Defendants' derivatives. Principally, Plaintiff does not plead that these put option prices obtained on the CBOE were sold with corresponding call options, or that they can be cancelled by their holder prior to their stated expiration date through the exercise of corresponding call options, as was the case with Defendants' options. Plaintiff also does not identify the volume of options available on the market within the reported bid-ask spreads, so he does not plead that the 3,230,606 put options acquired by the Defendants would (or could) have been obtained on the open market at the prices quoted.

Plaintiff also identified the open market pricing for call options quoted on the CBOE. He reports that "on February 12, 2013, a call purchased that day for Common Stock with a strike price of $24.00, a similar strike price to the Icahn Entities' options, and an expiration date of May 18, 2013 had an ask price of $13.00 per share." *Id.* ¶ 28. Plaintiff again acknowledges that his proposed comparator does not have identical terms to the calls acquired by Defendants. As with the prices obtained by Plaintiff for open market put transactions, this single reported ask price reflects the pricing of a stand-alone call option offered on the open market; it is not pricing for a call sold together with a corresponding put option. And, again, Plaintiff does not plead the volume of options available at the reported pricing.

Having assembled this market data for each of the transactions' legs, Plaintiff compares the reported prices paid by Defendants with the market prices. He observes that the amount that

Defendants were paid for their put options was lower than the market price.  At the same time, the exercise price for the call options acquired by Defendants was also lower than the market.  His conclusion is that "[i]nstead of demanding the *true* premium value for the Put Options, the Icahn Entities received a discount on the *true* premium value of their Call Options by an amount equal to the premium discount they provided with regard to the writing of the Put Options." *Id.* ¶ 28 (emphasis added).

Plaintiff also asserts that Defendants underpaid for the "time value" of each of the call options that they acquired.  To arrive at that conclusion, he first calculates what he terms the "intrinsic" value of each of the call options purchased by subtracting the exercise price from the average reported price of the stock. *Id.* ¶ 29.  The difference between the intrinsic value of the option, and the purchase price, he calculates to be the "time value" of the option. *Id.*  The time value of the call options acquired by Defendants, he asserts, is $0.02 per share. *Id.*  By comparison, the time value of open market stand-alone call options was $1.01. *Id.*  Ignoring the fact that the structure of the integrated puts and calls allowed the Defendants to cancel their puts and calls at any time, Plaintiff concludes that "[g]iven that the options did not expire for three months and the underlying price volatility of the Common Stock, the reported purchase price is not reflective of the economic reality of the transaction and would not be the *true* price achieved through arm's-length negotiations." *Id.* (emphasis added).

Here are some things that Plaintiff does not allege.  Plaintiff does not allege that Defendants received any income from the transaction other than the $0.01 per share premium.  The "value" that he seeks to characterize as a "premium received," and thereby capture as a "profit" is a discount on the purchase price for common stock upon exercise of the call.  Plaintiff also does not allege that Defendants acted in bad faith.  No facts are pleaded that suggest that the actual agreements entered into by the Defendants were other than arm's-length transactions with the counterparties.  As noted

above, Plaintiff alleges in a conclusory manner that the prices Defendants reported with respect to the transactions would not be the "true" price achieved through arm's-length negotiations. That assertion rests solely on Plaintiff's theoretical deconstruction of Defendants' transactions, however. No other facts are pleaded to support that conclusion.

At the end of his analysis of Defendants' trades, Plaintiff seeks to recover as short-swing profits the "deductions or offsets received by them with respect to payments made for Call Options." *Id.* ¶ 32. He asserts that the premium received by the Defendants for writing the put options "did not reflect the true economic value of those transactions," and, therefore asks that the discount that he calculates the Defendants received with respect to the call options be recharacterized as "premium" and be disgorged as short-swing profits.

Let's recap the analytical steps required in Plaintiff's theory to establish liability. There are a number of assumptions implicit in his theory, which, in his view, lead Plaintiff to be able to uncover the "economic reality" of Defendants' transactions:

1. *Assume that Defendants bought stand-alone puts and calls separately, rather than puts with corresponding calls in integrated "put and call agreements."*

   Plaintiff separates Defendants' integrated put and call agreements into two independent, separately priced legs.

2. *Assume that the pricing of stand-alone puts and calls is the same as that for puts sold with corresponding calls, in which the exercise of either cancels the other.*

   Plaintiff asks that we assume that the pricing of an integrated instrument in which the holder can control the timing of cancellation of the options, and, thereby, the duration of exposure to market fluctuations, will parallel the pricing for stand-alone options for which the writer cannot control the timing of exercise during their term. Plaintiff suggests that we must ignore the fact that, unlike the holder of stand-alone puts and calls, the Defendants were not exposed to market fluctuations for the full term of the puts and calls, but rather for as long as they liked. (In fact, Defendants exercised the calls approximately two weeks after their acquisition.) *Id.* ¶ 23.

3. *Assume that the open market prices available to Plaintiff are equivalent to the pricing available to Defendants over-the-counter.*

   Plaintiff acknowledges that the quotes that he obtained do not have identical terms to the

trades that he examined.  He also asks that we assume that Mr. Icahn and Defendants acquiring, in the case of Herbalife, a block of 3,230,606 shares, cannot reasonably be expected to obtain better (or even different) pricing over-the-counter than Plaintiff finds on a CBOE screen.  We must also assume that a sufficient number of options were available to complete the Defendants' trades at the open market prices that Plaintiff identified, and that volume would not affect pricing.

4.  *Assume that the Defendants' financial incentives are the same as an open market trader in stand-alone options.*

Plaintiff asserts that Defendants were paid less for their puts than a financial player selling puts on the open market, and, therefore, that the amount Defendants were paid for the put was not the "true" premium.  He asks us to assume that the financial incentives of a presumably long, 10% holder of a security are the same as those of any other market participant.  In other words, Plaintiff's premise is that a person who wants to buy something already (and owns a lot of it) should not be more willing to buy it (and, thus, to charge less to write a put forcing them to buy it) than a pure financial player.  We must also ignore the possibility that Defendants may have an intrinsic valuation of the security not driven by the day's market price.

5.  *Assume the accuracy of Plaintiff's valuation model and math.*

These assumptions, which hypothesize an alternative transaction and strip aside a number of basic economic concepts, reveal to Plaintiff what he terms the "economic reality" of the transaction. They allow him then to posit what he terms the put options' "true premium value"—namely, $0.01 *plus* "the amount equal to the premium discount" with respect to the call options.  *Id.* ¶ 28.  This takes us to Plaintiff's final assumption.

6.  *Assume that "value" obtained is the same as profit.*

Plaintiff seeks to recover his hypothesized discount in the purchase price of shares upon exercise of the call, as a short-swing "profit."  As noted, the complaints do not allege that Defendants received any income other than the $0.01 premium paid.  They were paid $0.01 for the put options, and paid a large amount upon exercise of the call options.  Plaintiff asks us to accept that a party makes a profit whenever they obtain the right to acquire an asset at a discount (based on the market price of the security on a specific date)—even before that asset is sold and the party yields the difference between the purchase price and the price of sale.

The chain of counterfactual hypotheses, assumptions, and inferences that form the basis of Plaintiff's claim is a bridge too far to establish that Defendants must disgorge more in profits than they already have—maybe five or six bridges too far.

11

### B. Procedural History

Plaintiff, proceeding *pro se*, commenced the first action in this trilogy on February 6, 2015. *Olagues v. Icahn, et al.*, No. 15-cv-898, Dkt. No. 1.  In that complaint, Plaintiff named as defendants the various Icahn entities as well as Herbalife, Nuance Communications, and Hologic, Inc.  *Id.*  After retaining counsel, Plaintiff filed an amended complaint on February 27, 2015, this time naming the Icahn entities and Herbalife, Ltd. as defendants.  Dkt. No. 2.  On May 7, 2015, the parties entered into a stipulation for Plaintiff to amend his complaint once again.  Dkt. No. 20.  And on May 8, 2015, Plaintiff filed his Second Amended Complaint against the Icahn Entities, this time omitting issuers from the caption.  Dkt. No. 21 (*i.e.*, the Herbalife Complaint).

Approximately one month earlier, Plaintiff filed a separate complaint against the Defendants and Hologic, Inc.  *Olagues v. Icahn, et al.*, No. 15-cv-2476, Dkt. No. 1 (S.D.N.Y. Apr. 1, 2015).  On the same day, Plaintiff also commenced a separate action against Defendants and Nuance Communications, Inc.  *Olagues v. Icahn, et al.*, No. 15-cv-2478, Dkt. No. 1 (S.D.N.Y. Apr. 1, 2015).  On May 6, 2015, Plaintiff filed a notice of voluntary dismissal as against Hologic, Inc.  No. 15-cv-2476, Dkt. No. 19.  On May 27, 2015, the parties entered into a stipulation of dismissal as against Nuance Communications, Inc.  No. 15-cv-2478, Dkt. No. 24.

On July 21, 2015, Defendants filed a motion to dismiss all three complaints and an omnibus memorandum of law addressing the allegations in the three actions.  *See, e.g.*, No. 15-cv-2476, Dkt. No. 30.  On August 20, 2015, Plaintiff filed three separate oppositions to Defendants' omnibus motion to dismiss, each referencing the specific transactions at issue in each action but relying on identical arguments and legal authority.  No. 15-cv-2476, Dkt. No. 34 ("Pl.'s Opp'n"); No. 15-cv-2478, Dkt. No. 35; No. 15-cv-898, Dkt. No. 37.  Defendants addressed the arguments in these three oppositions in a single omnibus reply.  *See, e.g.*, No. 15-cv-2476, Dkt. No. 35 ("Defs.' Reply").

## II.   Legal Standard

"Although on a motion to dismiss a court must accept all factual allegations as true and draw all inferences in the plaintiff's favor, dismissal is appropriate if the plaintiff can prove no set of facts that would entitle him to relief." *Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001), *cert. denied*, 535 U.S. 1054 (2002) (citations omitted).  Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege in their complaint facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this plausibility standard, plaintiffs must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Id.*

Legal conclusions need not be accepted as true, thus "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.*  (quoting *Twombly*, 550 U.S. at 557).  To avoid dismissal, plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III.   Discussion

### A.  Section 16 in General

Plaintiff alleges that Defendants are liable under the "short-swing profits" rule set forth in Section 16 of the Exchange Act.  Section 16 seeks to "prevent[ ] the unfair use of information which

may have been obtained" by statutory insiders of a company by requiring that any short-swing profits—that is, profits from purchases and sales of the company's equity securities taking place within six months of each other—be forfeited to the company. 15 U.S.C. § 78p(b); *see also Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) ("Section 16(b) of the Exchange Act seeks to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade.").

The statute applies to directors, officers, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security" of the issuer (a "10% owner"). 15 U.S.C. § 78p(a). Section 16(a) imposes certain reporting obligations on these insiders. Section 16(b) provides in relevant part that

> any profit realized by [such insider] from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such [insider] in entering into such transaction of holding the security . . . purchased or of not repurchasing the security . . . sold for a period exceeding six months.

15 U.S.C. § 78p(b). A suit to recover such profits may be maintained by the company or derivatively by a shareholder. *Id.*

Courts have described Section 16(b) as a "blunt instrument." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998). "[T]he application of Section 16 is largely mechanical, that is, independent of the purposes or state of mind of parties to a transaction." *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 291 (2d Cir. 2011) (citations omitted); *see also Magma Power*, 136 F.3d at 320-21; *Blau v. Lamb*, 363 F.2d 507, 515 (2d Cir. 1966) ("Section 16(b), it should be emphasized, embodies a rather uncommon regulatory mechanism. . . . [Its] purpose is effectuated by means of, what has been termed, a 'crude rule of thumb.'") (citations omitted).

Indeed, under the plain language of the statute, "[n]o showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Magma Power*, 136 F.3d at 320 (citation omitted). Thus, although an insider could make improper use of inside information to profit through trades taking place six months and one day from each other, the statute applies only to purchases and sales within six months of each other. Conversely, an insider could make trades within less than six months of each other without the benefit of any particular inside knowledge, but would be subject to the statute's requirement to return profits from those trades to the company. This is because, as the Supreme Court noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). The Court quoted an earlier decision from the Seventh Circuit, which observed that

> [i]n order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.

*Id.* (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)); *see also Magma Power*, 136 F.3d at 321 ("Congress believed that such a blunt instrument was the only way to control insider trading.")).

In light of the arguably "arbitrary and sweeping coverage" of the statute, *Reliance*, 404 U.S. at 422, courts have been consistent in holding that in order for liability to attach, the requirements of the statute must be met—it is not enough for a transaction to fall under the broader category of evils that the statute was meant to curb. As the Second Circuit has held, "even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met." *Gwozdzinsky*, 156 F.3d at 310 (citation omitted). Thus, "[i]n

short, this statute imposes liability without fault [but only] within its narrowly drawn limits."
*Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976).  *Cf. id.* at 252 ("It is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language.  If Congress wishes to impose such liability, we must assume it will do so expressly or by unmistakable inference.").

As the Second Circuit has summarized, "liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period."  *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky*, 156 F.3d at 308).  In this case, there is no dispute that Defendants were 10% owners, and that the transactions at issue yielded short-swing profits under Section 16(b); Defendants concede that they were and have reimbursed the profits that they and the issuers calculate to be due.[5]  The question before the Court is what the correct measure of the "short-swing profit" to be disgorged should be with respect to the type of derivative securities at issue here.

### B.  Section 16(b) and Derivative Securities

In 1991, the SEC amended its regulations in response to the "proliferation of derivative securities and the popularity of exchange traded options," and the "uncertainty surrounding the application of Section 16" to these types of securities.  Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34–28869, Investment Company Act Release No. 35–25254, 56 Fed. Reg. 7242–01, 7248 (Feb. 21, 1991) ("1991 Report").  A derivative security is a "financial instrument that derive[s its] value (hence the name) from an

---

[5] In their memorandum of law, Defendants suggest alternative grounds for dismissal, including that Defendants did not meet the criteria for statutory insiders under Section 16(b).  Defs.' Br. at 3 n.2.  Because the alternative grounds for dismissal were not fully briefed in Defendants' motion, the Court will not consider them here.

underlying security or index." *Magma Power*, 136 F.3d at 321.  The amendments to the regulations were based on the SEC's conclusion that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of section 16, since the value of the derivative securities is a function of or related to the value of the underlying equity security."  1991 Report at 7248.  Accordingly, transactions involving derivative securities could be equated to purchases and sales of the underlying securities for purposes of incurring liability under Section 16(b).  The put and call options at issue in this case are derivative securities for purposes of the rule.

The SEC's 1991 regulations of derivatives are based on examining the actual financial consequences of purchasing or selling particular options.  Under the SEC's amended regulations, "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act."  Rule 16b–6(d).

In the 1991 regulations, the SEC established rules to calculate the amount of short-swing profits yielded by covered derivative transactions.  In so doing, the SEC was motivated by "a strong desire to avoid the 'battle of the experts' in every case."  *Segen v. Westcliff Capital Management, LLC*, 299 F. Supp. 2d 262, 270 (S.D.N.Y. 2004).  The SEC said as much in its proposing release for Rule 16b–6:

> Substantial progress has been made in the valuation of options and derivative instruments, and techniques such as the Black–Scholes option valuation formula and its progeny are now widely used by traders in the marketplace. . . .  The Commission recognizes, however, that the interests of precision must be balanced against the costs of computation.  *The interests of justice and Congress' purpose in adopting Section 16(b) will not be served by turning every case involving derivative instruments into a battle of experts over competing models of option valuation.*  Accordingly, the Commission seeks to provide certain benchmarks or rules of thumb to be applied in short-swing transactions involving derivative securities.

SEC Release No. 34–26333, 53 Fed. Reg. 49997, 5009 (Dec. 13, 1988) (emphasis added) (footnotes omitted).

The 1991 regulations cap the profit subject to recovery from the cancellation of a put option within six months after its issuance. As noted above, under Rule 16b-6(d) "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b) of the Act. *The profit shall not exceed the premium received for writing the option.*" Rule 16b–6(d) (emphasis added). In other words, "[u]nder this provision, if an insider writes an option that expires unexercised within six months and profits from doing so on account of having been paid by the purchaser for a right to buy shares that the purchaser did not exercise, the writer will be held liable under section 16(b) *for the amount the purchaser paid him or her for the option.*" *Allaire Corp. v. Okumus*, 433 F.3d 248, 252-53 (2d Cir. 2006) (citing *Gwozdzinsky*, 156 F.3d at 309) (emphasis added). "This rule is designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a[n] . . . option, and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months." *Gwozdzinsky*, 156 F.3d at 309.

### C. Plaintiff Cannot Artificially Recast Defendants' Transactions

As outlined above, Plaintiff's theory rests on the fragmentation of Defendants' transaction into two hypothetical separate transactions, and the subsequent revaluation of those component parts. That is unsteady ground. Courts have long cautioned against "recast[ing] the actual transaction into [plaintiff's] hypothetical one in order to create liability under § 16(b)." *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1283 (9th Cir. 1982). In particular, courts have rejected plaintiffs' attempts "to fragmentize" transactions into their component parts in order to establish liability under Section 16(b). *Schur v. Salzman*, 365 F. Supp. 725, 730 (S.D.N.Y 1973). "To probe into the component parts of the price received by or paid to an insider would detract from the objective test in appraising transactions . . . ." *Id.* at 731; *see also Freedman v. Barrow*, 427 F. Supp. 1129, 1152

(S.D.N.Y. 1976) (rejecting a "strained attempt to carve up a single . . . transaction by calling it something which it is not" for the purpose of Section 16(b) liability)).

Here, Plaintiff's "conceptual theorizing seeks to displace the reality of events." *Colan v. Cont'l Telecom, Inc.*, 616 F. Supp. 1521, 1526 (S.D.N.Y. 1985), *aff'd sub nom. Colan v. Cont. Telecom Inc.*, 788 F.2d 2 (2d Cir. 1986). As described above, Plaintiff's theory rests on the conceptual premise that that integrated puts and corresponding calls—the exercise of each of which by the common holder cancels the other—should have the same pricing as two separate transactions representing its component parts divided into separate legs. Plaintiff's theory proceeds from that premise with the series of implicit assumptions outlined above. Those assumptions, however, do not model economic reality; instead they eliminate variables that profoundly affect the economic reality of the transactions—such as differences in time exposure, and, therefore, market risk, differences in pricing mechanisms and opportunities, and differences in financial interests of market players. Plaintiff's theory that "economic reality" is best arrived at through the application of such flawed assumptions is not sound. The Court concludes that here, as in *Colan*, Plaintiff's "ipse dixit claim is a quantum leap that disregards the factual attendant circumstances that led to the execution of the" transactions. *Id.*

Plaintiff asserts that the $0.01 premium price was "a contrivance" and "did not reflect the true value of the consideration obtained by the Icahn Entities." Herbalife Compl. ¶ 31. Even if the premium amount was an intentional contrivance, however, it would not enlarge Defendants' liability beyond the $0.01 per share premium already disgorged. For it is well established that "[l]iability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b)." *Reliance*, 404 U.S. at 422. "Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power*, 136 F.3d at 320-21; *see also CSX Corp.*, 654

F.3d at 291 (2d Cir. 2011); *Donoghue v. Murdock*, No. 13 CIV. 1224 PAE, 2013 WL 4007565, at *4 (S.D.N.Y. Aug. 6, 2013). "That the sequence of events may have been deliberately designed is of no consequence. There is nothing improper or illegal in seeking to avoid the impact of Section 16(b)." *Lewis v. Bradley*, 599 F. Supp. 327, 330 (S.D.N.Y. 1984) (citations omitted). Anything short of this mechanical application would inevitably result in a "judicial search for the will-o'-the-wisp of an investors' 'intent' in each litigated case." *Reliance*, 404 U.S 425. The Court does not accept Plaintiff's premise that the transactions can be reframed and repriced, revealing that Defendants intentionally structured the integrated agreements to sidestep the full extent of their liability under Section 16(b). But even if so, that would not make Defendants liable. "Such is the price of easy administration." *Magma Power*, 136 F.3d at 321 (internal quotation marks and citations omitted).

The cases Plaintiff cites in support of his position are inapposite. First, they predate the 1991 amendments, and, therefore, do not address the SEC's limitation of profit in the context of a cancelled put to the "premium received." Second, and more significantly, each of the cases assess the proper treatment of elements of an *actual* transaction; they do not begin, as Plaintiff does here, by reconfiguring the actual transaction into hypothetical alternative transactions.

For example, Plaintiff cites the Seventh Circuit's decision in *Bershad v. McDonough* for the proposition that it is the "commercial substance of the transaction rather than its form [that] must be considered." 428 F.2d 693, 697 (7th Cir. 1970). Plaintiff's reliance on this case, like several others cited, is misplaced, because the first step in Plaintiff's analysis—the hypothetical deconstruction of Defendants' actual transactions into two separate, independent legs—transfigures the commercial substance of Defendants' transactions. While courts, like the court in *Bershad*, have allowed plaintiffs to explore whether the elements of an actual transaction are properly characterized, they do so by reference to the commercial substance of the actual transaction; they do

not support the proposition that liability can be established through the analysis of a hypothetical alternative transaction, which is where Plaintiff begins.

Similarly, in *Reece Corporation v. Walco National Corporation* the court questioned whether two separate sales should be treated as one for the purpose of Section 16(b) liability. 565 F. Supp. 158, 162-63 (S.D.N.Y. 1981). The court answered that question in the affirmative, having determined that "[a]lthough there was no express legal tie between the two phases, the transaction was structured with the expectation that one would not be carried out without the other." *Id.* at 162. The court concluded that any "attempt to divide it into two 'sales' was wholly artificial and contrived." *Id.* While Plaintiff cites this decision to support his position, it is his approach that artificially divides Defendants' transactions.

Similarly, Plaintiff points to *Herrmann v. Steinberg*, in which Plaintiff notes that the Second Circuit looked to the substance of the agreement because it "had an appearance of artificiality," Herbalife Opposition at 12 (citations omitted). In that case, the target of a hostile tender offer sought to neutralize the offer, in part by purchasing the suitor's outstanding holdings in the company. 812 F.2d 63, 66 (2d Cir. 1987). The target also paid the suitor $28 million dollars as an "expense reimbursement." *Id.* Commenting that labelling the $28 million payment as an expense reimbursement (as opposed to greenmail) "has an appearance of artificiality," the Second Circuit remanded the case to the district court to determine whether to attribute a portion of the $28 million payment to the purchase price of the suitor's shares. *Id.* In doing so, the court observed that "it would be simplistic to divorce the abandoned tender offer completely from [the target's] purchase of [the suitor's] holdings . . . ." *Id.* The Second Circuit did not, however, suggest that the district court must deconstruct the economics of the transaction as a whole to arrive at the correct measure of profits under Rule 16b—rather, merely that it examine the characterization of an actual payment made in the context of an integrated transaction. In these cases, it is the Plaintiff who simplistically

divorces elements of Defendants' actual transactions—by hypothetically separating them into two separate legs with characteristics that deviate significantly from the economic substance of the actual transactions.

Remember that "the application of Section 16 is largely mechanical, that is, independent of the purposes or state of mind of parties to a transaction." *CSX Corp.*, 654 F.3d at 291. The objective focus of Rule 16(b) is not promoted by Plaintiff's theory—which posits that liability should rest on "economic reality" determined by him through reference to alternative hypothesized transactions. Acceptance of Plaintiff's approach would, instead, engender in every case the kind of "battle of the experts" that the SEC sought to avoid when it promulgated the 1991 regulations. *Segen*, 299 F. Supp. 2d at 270.

### D.  The Premium Received Does not Include the Value of Discounted Calls

Even accepting the validity and accuracy of Plaintiff's proposed reconfiguration of Defendants' transactions, the "deductions" on the call price that he would add to the put premium is not a "profit." As described above, in the 1991 regulations the SEC established a concrete measurement of the profit obtained upon cancellation of a put option: "*The profit shall not exceed the premium received for writing the option.*" Rule 16b-6(d). The SEC did not define "premium" in its release, but the Second Circuit has since described it as "*the amount the purchaser paid him or her for the option.*" *Allaire Corp.*, 433 F.3d at 252-53 (citing *Gwozdzinsky*, 156 F.3d at 309) (emphasis added). This description is consistent with the common understanding of the term "premium." *See, e.g.*, Black's Law Dictionary 1371 (Bryan Garner, et al., eds., 10th ed. 2014) (defining "premium" as the "amount paid at designated intervals for insurance . . . .").

Recognizing that no amount was paid to Defendants other than the $0.01 per share, Plaintiff attempts to reframe the rule to require reimbursement of "premium consideration obtained," instead of premium received. Herbalife Comp. ¶ 30. He calculates that premium consideration obtained to

include the amount of the discounted exercise price on the call options.  Plaintiff points to no precedent that supports his interpretation of the rule.  The Court finds no reason to reconstruct the language of Rule 16b-6(d) to make it more expansive than the SEC expressly provided.

More importantly, Plaintiff's position that the hypothesized bargain on the call option should be treated as a profit is simply illogical.  A "profit" is the "excess of revenues over expenditures in a business transaction."  BLACK'S LAW DICTIONARY 1404.  Assuming that Defendants obtained the right to exercise call options at a discount, then exercised the call right at that discounted price, they would not obtain a profit until they sold the asset, yielding revenues in excess of their expenditures.  Here, Defendants made expenditures to purchase shares upon exercise of the call options, and they received the $0.01 per share premium for writing the put options.  Plaintiff does not allege that Defendants realized any revenue with respect to the call options in excess of their expenditures within the 6 month window for short-swing liability—the only revenue that they received was the $0.01 per share premium, which Rule 16b-6(d) defines as profit.

Plaintiff mistakes "value" for profit.  For even if Defendants obtained "value" through a discounted premium price, unrealized value is not a profit.  Profit from the discount comes, if ever, when the securities are sold at a gain.  You don't have a profit if you buy a share of IBM at the market price *less* two dollars, even if you have $2 of value.  You have a profit when you then sell the cheap stock at the market price.  Plaintiff ignores the fact that if the value of the security went down after the Defendants received the "discounted" right to buy shares, instead of up, the "value" of his hypothesized discount would disappear.  Plaintiff's artificially freezes the "value" of the discount on a single day, which helps him enhance his theorized recovery, but ignores the fact that the value of that discount will change with a fluctuating market.  In short, unrealized "value" is not a synonym for profit—but Plaintiff's theory rests on that assumption.

### E.  Defendants' Actual Transactions Do Not Have Indicia of Speculative Abuse

Finally, the Court does not see a basis to conclude that the *actual* transaction that Defendants engaged in bears indicia of speculative abuse that are not remedied by reimbursement of the $0.01 per share premium.[6]  This decision has focused to this point on the flaws in Plaintiff's hypothetical reframing of Defendants' transactions because that is the basis for Plaintiff's claims.  But, even though Defendants' transaction is not "unorthodox," it is worthwhile to touch briefly on the question whether the actual transaction entered into by Defendants lend themselves to speculative abuse that should be addressed through an expansive reading of Rule 16b-6(d).

"The two primary 'indices' used for measuring the potential for speculative abuse are (1) the defendant's access to inside information (as distinguished from possession of it), and (2) the defendant's ability to influence the timing and circumstances of the transaction at issue." *Donoghue v. Casual Male Retail Grp., Inc.*, 375 F. Supp. 2d 226, 231-32 (S.D.N.Y. 2005) (citations omitted). Plaintiff maintains that "the possibility of speculative abuse is apparent" from this structure because "Defendants could have written the Put Options and taken in the premiums with knowledge from insider information that the Put Options would never be exercised and that they would get to keep the premiums upon the expiration of the Put Options." Herbalife Opposition at 16.  That, of

---

[6] The Court recognizes that Defendants' transactions are not "unorthodox;" they fall within the four corners of Rule 16b-6(d).  Courts will scrutinize "borderline" or "unorthodox" transactions by asking "'whether they serve as a 'vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based on access to inside information.'" *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012) (quoting *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 & n. 26); *see also Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 126 (2d Cir. 2002) (applying the *Kern County* analysis and determining that no possibility of speculative abuse of inside information existed with respect to the transactions at issue).  This "pragmatic' approach to §16(b)," the Supreme Court reasoned, "will best serve the statutory goals." *Kern Cnty.*, 411 U.S. at 595 n.26.  It is only when analyzing financial instruments that fall within this category that courts may look beyond the agreement's terms and "ask[] whether the particular type of transaction involved is one that gives rise to speculative abuse." *Kern*, 411 U.S. at 595 (internal quotation marks and citations omitted); *see also DiLorenzo v. Murphy*, 443 F.3d 224, 227-28 (2d Cir. 2006) (quoting *Kern*, 411 U.S. at 595).

course, is true; Plaintiff is merely paraphrasing the purpose of Rule 16b-6(d) as described by the Second Circuit in *Gwozdzinsky*, 156 F.3d at 309.

What is missing, however, is any argument explaining how any element of Defendants' transaction—beyond receipt of the $0.01 per share premium—shows indicia of speculative abuse within the 6 month short-swing window.  Even without taking judicial notice of the asserted fact that the transactions were "Delta One" transactions, the basic structure of the transactions described in the complaints show that Defendants were long the security—they were committed to buy with the put, and obtained the right to buy through the call.  Thus, the Defendants' transactions were not structured to obtain a "quick [in-and-out] profit" through "'short swing speculation' by company insiders." *Gibbons v. Malone*, 801 F. Supp. 2d 243, 246 (S.D.N.Y. 2011), *aff'd*, 703 F.3d 595 (2d Cir. 2013).  Rather, the transactions were structured as "in and in"—both legs were designed to allow Defendants to acquire more stock.  Defendants did acquire that stock; there is no allegation that they sold it for a profit within the short-swing profit window.  Plaintiff accurately identifies the one element raising the prospect of speculative abuse—the payment of the premium, which Defendants disgorged.  He does not provide a justification for treating any other element of the transaction as "profit" that should increase that amount.

Simply put, apart from the rationale for disgorging the $0.01 per share premium, "conspicuously absent from [Plaintiff's] arguments . . . is an explanation of how the challenged transactions herein give rise to speculative abuse or constitute short-swing speculation by insiders . . . ." *Rosen v. Drisler*, 421 F. Supp. 1282, 1286 (S.D.N.Y. 1976); *see also Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 426 (S.D.N.Y. 2013) (dismissing a shareholder action alleging Section 16(b) violations and reasoning that plaintiff's argument that "there is a *potential* for misuse of insider information" was based on a misunderstanding of the transaction at issue).  The exercise price for the call options was fixed at the time the transactions were executed (and, in fact, no called shares

were sold during the short-swing window).  As Second Circuit did in *Gwozdzinsky*, the Court rejects Plaintiff's "attempt to bring this transaction within the ambit of Section 16 by invoking the policy argument that it is the type of speculative, short-term profit-taking the statute was designed to prevent.  This 'policy argument' turns case law on its head.  The statute, as written, establishes strict liability for all transactions that meet its mechanical requirements.  When courts have looked to policy, it was to avoid the sometimes harsh results of this inflexible rule." *Gwozdzinsky*, 156 F.3d at 310.

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted in all three actions with prejudice.  The dismissal is without leave to replead the claims, because any attempt to replead the claims on the theoretical basis asserted by Plaintiff would be futile.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (noting that leave to amend need not be granted where the proposed amendment would be futile).

The Clerk of Court is directed to terminate the motions pending at Dkt. No. 30 (1:15-cv-2476), Dkt. No. 31 (1:15-cv-2478), Dkt. No. 33 (1:15-cv-898), and to close each of those cases.

SO ORDERED.

Dated:  March 23, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge